UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RAYMOND WHITE,

                         Plaintiff,

v.

CITY OF BUFFALO POLICE OFFICER
ROBERT LARUSCH, *et al.*,

                       Defendants.
_____

**REPORT AND
RECOMMENDATION**

18-CV-1245-JLS-JJM

       Plaintiff Raymond White commenced this action pursuant to 42 U.S.C. §§1983 and 1988, alleging violations of his Fourth Amendment rights in connection with his arrest after an incident at Buffalo General Medical Center on August 2, 2017. Amended Complaint [22][1]. He asserts claims of false imprisonment, excessive force, and malicious prosecution, and names as defendants City of Buffalo police officers Robert LaRusch, Brandon Hawkins, Lauren Tripp and Zachary Williams (the "City defendants"), and Kaleida Health peace officers Jon Gullo, Lieutenant Ciechalski, William O'Sullivan, James Ratel, and Robert Kemp (the "Kaleida defendants"). Id.

       Before the court are the City defendants' and the Kaleida defendants' motions for summary judgment [50, 52] pursuant to Fed. R. Civ. P. ("Rule") 56, which have been referred to me by District Judge John L. Sinatra, Jr. for initial consideration [14]. Having reviewed the parties' submissions [50, 52, 53, 57, 59, 62, 63, 67] and heard oral argument on March 17, 2022 [64], I recommend that both motions be granted.

---

[1]     Bracketed references are to CM/ECF docket entries (unless otherwise noted). Page references are to CM/ECF pagination (upper right corner of the page).

## BACKGROUND

The parties' versions of events differ in several material aspects. The relevant facts are as follows, noting where the stories diverge. On August 2, 2017, White and his brother were visiting their mother on the sixth floor of the Buffalo General Medical Center. Kaleida defendants' Statement of Uncontested Facts ("SOUF") [53] at ¶1; White's SOUF [59-1] at ¶1. At approximately 5:00 p.m., the two men got into an "argument" or "fight" in the waiting room regarding their mother's care. Kaleida defendants' SOUF [53] at ¶1, City defendants' SOUF [50] at ¶1; White's SOUF [59-1] at ¶1. The altercation lasted about five minutes, during which time both men were yelling. White Deposition [52-4] at 27, 32. A call was made to hospital security indicating the occurrence of a "fight in progress" on the sixth floor, and Kaleida Health peace officers Sergeant Jonathan Gullo and Lieutenant Nicholas Ciechalski responded. Ciechalski Deposition [52-5] at 7, 27; Gullo Deposition [52-6] at 8-9, 36; City defendants' SOUF [50] at ¶2. Ciechalski briefly spoke to unidentified members of the nursing staff on the floor, who told them there had been a "physical altercation". Ciechalski Deposition [52-5] at 38.

White left the waiting room and began walking toward the elevator. White Deposition [52-4] at 33; Gullo Deposition [52-6] at 31. At some point, in or near the elevator on the sixth floor, Sergeant Gullo met up with White and attempted to speak to him. White Deposition [52-4] at 33-34; Gullo Deposition [52-6] at 31. White was "upset" and "didn't want to answer any questions". White Deposition [52-4] at 36; *see* Gullo Deposition [52-6] at 28. White testified that he told Gullo that he and his brother had an "argument" and that he was going home. White Deposition [52-4] at 36. Gullo recounts a similar interaction except that White told him that he was "fighting" with his brother. Gullo Deposition [52-6] at 28. Gullo rode

with White on the elevator down to the ground floor. White Deposition [52-4] at 37; Ciechalski

Deposition [52-5] at 12.[2]

   Upon reaching the ground floor, White continued toward the exit, intending to

leave the facility. White Deposition [52-4] at 38; Ciechalski Deposition [52-5] at 12. The two

peace officers followed White, telling him that he needed to stop and speak with them about the

incident. Gullo Deposition [52-6] at 50; Ciechalski Deposition [52-5] at 13-14, 18. At some point

prior to reaching the exit, Lieutenant Ciechalski put his hand on White's shoulder and told him to

stop. Ciechalski Deposition [52-5] at 16, 18; White Deposition [52-4] at 38-39; Gullo Deposition

[52-6] at 50. The parties differ as to how White responded to this action. White testified that he

"struggled to get away" from the officers. White Deposition [52-4] at 39. Gullo testified that

White "pulled away aggressively" and "tr[ied] to grab/strike Lieutenant Ciechalski". Gullo

Deposition [52-6] at 50.  Ciechalski, testified that White responded "[w]ith a quick movement

towards me". Ciechalski Deposition [52-5] at 17.

   At my request, and by stipulation of the parties [66], surveillance videos of the

incident were submitted and filed as post-argument Exhibit 1 [67].  By any account, a physical

struggle among the three men ensued. City defendants' SOUF [50] at ¶3; White's SOUF [57-1]

at 3; Exhibit 1 [67]. Eventually, other Kaleida Health peace officers arrived on the scene, pinned

White to the ground, and placed him in handcuffs. Exhibit 1 [67]; City defendants' SOUF [50] at

¶3; White's SOUF [57-1] at ¶3.

   Kaleida peace officers took White to another Kaleida facility on Main Street in

Buffalo, where White was transferred to the custody of the City defendants. City defendants'

---

[2] White claims that Ciechalski was also in the elevator with him (White Deposition [52-4] at 36-37), but Ciechalski testifies that he missed the elevator and met up with White and Gullo in the lobby (Ciechalski Deposition [52-5] at 12).

SOUF [50] at ¶4; White's SOUF [57-1] at ¶4. The City defendants had no interaction with White prior to this point. City defendants' SOUF [50] at ¶5; White's SOUF [57-1] at ¶5. Buffalo police officers LaRusch and Humphrey transported White to central booking to be processed. City defendants' SOUF [50] at ¶6; White's SOUF [57-1] at ¶6; LaRusch Declaration [50] at ¶7. Officer LaRusch charged White with harassment in the second degree and obstructing governmental administration in the second degree. City SOUF [50] at ¶7; White's SOUF [57-1] at ¶7; LaRusch Declaration [50] at ¶8. Officer LaRusch had no personal knowledge of the incident, and charged White solely based on information provided to him by Sergeant Gullo. City SOUF [50] at ¶7; White's SOUF [57-1] at ¶7; LaRusch Declaration [50] at ¶¶5, 6, 8. This information included a "supporting deposition" completed by Sergeant Gullo that was provided to Officer LaRusch at the time custody was transferred. LaRusch Declaration [50] at ¶¶6, 8 (referring to Supporting Deposition of Jon Gullo dated August 2, 2017 [52-7]).[3]

At some later date, the charges against White were dismissed. Defendants contend that the Kaleida officers decided not to pursue the charges out of respect to White and the difficult and emotionally charged situation with his mother's health. Kaleida defendants' SOUF [53] at ¶14; City defendants' SOUF [57-1] at ¶9. Conversely, White testified that the charges were dismissed only after a trial was scheduled, and the peace officers did not show up. White's SOUF [57-1] at ¶9; White Deposition [52-4] at 116-17.

White filed the Complaint [1] commencing this action on November 11, 2018, and then filed an Amended Complaint [22] on April 23, 2020. Depositions were taken of White

---

[3]     White "disputes" that Sergeant Gullo prepared or provided this supporting deposition at the time of his transfer to the Buffalo Police Department custody, or even prior to Officer LaRusch's filing the charges against White. White's SOUF [57-1] at ¶¶7-8. However, as discussed herein, the uncontested evidence supports defendants' version of events. *See* LaRusch Declaration [50] at ¶¶6, 8; Supporting Deposition of Jon Gullo dated August 2, 2017 [52-7]; Gullo Deposition [52-6] at 47.

[52-4], defendant Gullo [52-6], and defendant Ciechalski [52-5]. The City defendants filed a motion for summary judgment on January 5, 2022 [50], including as exhibits the two misdemeanor/ violation informations completed by Officer LaRusch [50-1], the Supporting Deposition of Jon Gullo dated August 2, 2017 [50-1], the LaRusch declaration ([50] at 3-4), and excerpts from the three deposition transcripts [50-2, 50-3, 50-4]. The Kaleida defendants filed their motion for summary judgment on January 14, 2022 [52], including as exhibits the pleadings [52-2, 52-3], the full deposition transcripts [52-4, 52-5, 52-6], and the Supporting Deposition of Jon Gullo dated August 2, 2017 [52-7]. White's opposition to the two motions [57, 59] included many of the same documents, but also included a Certificate of Disposition dated October 18, 2018 [57-5, 59-5], as well as some photos of his arm [59-9] and his medical records [59-10]. Oral argument was held on March 17, 2022. [64]. At the request of the court, and by stipulation of the parties [66], post-argument Exhibit 1 [67] was submitted containing surveillance videos of the confrontation.

## DISCUSSION

White asserts the following §1983 claims: (1) false imprisonment as against all defendants; (2) excessive force as against Kaleida defendants Gullo and Ciechalski; and (3) malicious prosecution as against City defendant LaRusch. Amended Complaint [22]. The defendants move for summary judgment on each of those claims. [50, 52].

### A.    Summary Judgment Standard

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences

in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

**B.    False Arrest/Imprisonment**

White asserts a claim of false imprisonment against all defendants with respect to their detention and confinement of him on August 2, 2017 and thereafter. Amended Complaint [22] at ¶¶36-43. Defendants move to dismiss this claim on the grounds that the detention and confinement of White was, at the applicable stages, privileged by probable cause and/or qualified immunity. [50] at 8-12; [52-8] at 2-4.

"To succeed on a false arrest/false imprisonment claim, a plaintiff must prove that (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." DeSantis v. Town of Cheektowaga, 2020 WL 1530773, *10 (W.D.N.Y. 2020) (citing cases). As there is no question as to the first three elements here, my focus is solely on the fourth, *i.e.*, whether the confinement of plaintiff was "privileged".

An arrest is privileged when "an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." Simpson v. City of New York, 793 F.3d 259, 265 (2d Cir. 2015). Probable cause "is a complete defense to an action for false arrest brought under New York law or §1983". Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam). "A finding of probable cause is made based on the totality of the circumstances." Alexis v. Town of Cheektowaga, 2021 WL 5239900, *5 (W.D.N.Y. 2021). An officer has probable cause to arrest or detain "when he or she has knowledge or reasonably trustworthy information of facts and

circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

Moreover, an officer is entitled to qualified immunity "unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Soto v. Gaudett, 862 F.3d 148, 156 (2d Cir. 2017). "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Hernandez v. Mesa, ___ U.S. ___, 137 S. Ct. 2003, 2007 (2017). Qualified immunity applies if "any reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that the challenged action was lawful." Muschette on Behalf of A.M. v. Gionfriddo, 910 F.3d 65, 70 (2d Cir. 2018).

The validity of White's  requires analysis of the facts and circumstances at three points in time: (1) Ciechalski's placement of his hand on White's shoulder; (2) White's reaction to the Ciechalski's hand on his shoulder; and (3) White's transfer to the City defendants' custody.

### 1. Ciechalski's Placing His Hand on White's Shoulder

The video evidence shows the three men - White, Ciechalski, and Gullo - walking down a corridor of Buffalo General Medical Center toward an exit door, with White in the lead and Ciechalski and Gullo very close behind. Exhibit 1c [67-3]. White's head turns toward Ciechalski as the two men exchange words. Id. In the next clip, the three men emerge, presumably from that hallway exit, into a glass-enclosed area just before the final set of doors leading outside. Exhibit 1a [67-1]. A few seconds after White emerges from the doorway,

Ciechalski can be seen to place his left hand on White's right shoulder, an action which causes White to turn around so that he is walking backwards as the two peace officers proceed to grab him and a protracted struggle ensues. Id.

Initially, the Kaleida defendants do not concede that this initial action by Ciechalski constituted a seizure of White, and instead characterize it as a mere "request . . . for further information". Kaleida defendants' MOL [52-8] at 4. The Kaleida defendants argue that "[i]t was not until Plaintiff became combative with Gullo and Ciechalski that any attempt to physically detain Plaintiff was made" (id.), which, they contend, occurred after the initial contact by Ciechalski. See id. ("[p]laintiff was arrested for . . . his agitated physical response to Ciechalski"). In any event, the officers argue that they had probable cause based on the information they possessed at the time they encountered White. See id. at 3.

This characterization of the initial grab as "not a 'seizure'" is untenable, given Ciechalski's express intent in grabbing White's shoulder. See Ciechalski Deposition [52-5] at 18 ("Q. Okay. And . . . what was the purpose of [you touching White's shoulder]? A. I was telling him to stop. He had to stop and speak to us."). More importantly, it is incompatible with the law defining seizure. See California v. Hodari D., 499 U.S. 621, 626 (1991) ("[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."); United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013) ("[t]he contention that [the officer] grabbing Freeman around the waist in a 'bear hug' was not 'in some way restraining' his liberty is simply wrong"). White was plainly seized by Ciechalski the moment he grabbed his shoulder with the intent of stopping him from leaving. .

The issue then becomes whether this initial seizure of White was justified. This analysis is dictated, as White suggests, by the investigatory stop standard articulated in Terry v.

Ohio, 392 U.S. 1 (1968), and its progeny. As explained by the Supreme Court, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see United States v. Bell, 733 F. App'x 20, 21 (2d Cir. 2018) (Summary Order). Stated differently, a law enforcement officer may conduct such a stop when he "has a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396 (2014) (internal quotations omitted). The requirements under this standard are "obviously less" than that of probable cause. Id.

An investigatory stop must be justified "at its inception", and the court considers only the facts known to the officers at the time of the stop. Terry, 392 U.S. at 20; see Dancy v. McGinley, 843 F.3d 93, 108 (2d Cir. 2016). While reasonable suspicion "is not a high threshold" (United States v. Lawes, 292 F.3d 123, 127 (2d Cir. 2002)), "it demands 'specific and articulable facts which, taken together with rational inferences from those facts,' provide detaining officers with a 'particularized and objective basis for suspecting wrongdoing". United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014) (internal citations omitted). Further, under the "collective or imputed knowledge doctrine", the knowledge of one officer may be attributed to all officers involved in the stop for the purposes of establishing probable cause or reasonable suspicion. United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001).

White argues that the dispatch to which the Kaleida officers responded was a mere "anonymous tip" that required additional corroboration, particularly as to the alleged criminal behavior. [59] at 12. Whether or not that is true,[4] the officers here did not merely rely

---

[4]      *Compare* Florida v. J.L., 529 U.S. 266, 272 (2000) (an anonymous tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person") *and* Freeman, 735 F.3d at 97 *with* Alabama v. White, 496 U.S. 325 (1990) (anonymous tipster told the police that a woman carrying cocaine, after confirming the innocent details, officers stopped the station wagon as it neared the motel

on such a tip, as Ciechalski testified that he personally (albeit briefly) spoke to a nurse after receiving the call and before encountering White, and the nurse told him that there had been a physical altercation involving White and his brother. Ciechalski Deposition [52-5] at 38. Assuming this uncontradicted testimony to be true, then we are no longer dealing with an anonymous tipster, but a known person, an employee of the hospital, who would presumably face consequences for providing false information to the officers. *See* United States v. Salazar, 945 F.2d 47, 50-51 (2d Cir. 1991) ("a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false"). Indeed, the Second Circuit has held that "information provided by 'an identified bystander with no apparent motive to falsify' has 'a peculiar likelihood of accuracy,'" and it has "endorsed the proposition that 'an identified citizen informant is presumed to be reliable'". Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (citation omitted).

   Thus, at the moment of the initial seizure, the Kaleida officers possessed the following information: a dispatch indicating the occurrence of a "fight in progress" on the sixth floor; an in-person confirmation of that information and the physical nature of the fight by a member of the nursing staff; and, finally, the officers' own observations during a tense pre-arrest interaction with White, including White's admission that he had been involved with some manner of confrontation with his brother. This collection of facts, particularly the existence of an eyewitness employee and the confirmation of White's involvement in the incident, sufficed to establish probable cause for White's seizure. *See* Fabrikant v. French, 691 F.3d 193, 216 (2d Cir. 2012) ("[a] law enforcement official has probable cause to arrest if he received his information

---

and found cocaine); *see also* United States v. Arvizu, 534 U.S. 266, 277 (2002) (reasonable suspicion "need not rule out the possibility of innocent conduct").

from some person, normally the putative victim or eyewitness, unless the circumstances raise

doubt as to the person's veracity"); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)

(same); Gutierrez v. New York, 2021 WL 681238, *7 (E.D.N.Y. 2021) (collecting cases).

  At the very least, these facts were sufficient to establish sufficient cause for an

investigatory stop of White. See, e.g., United States v. Simmons, 560 F.3d 98, 105 (2d Cir. 2009)

(reasonable suspicion existed to stop a suspect when officers were responding to a dispatch that

communicated an assault in progress, and the officers confirmed the suspect's appearance

matched the description the suspect was present at the specified location); Johnson v. City of

Mount Vernon, 2012 WL 4466618, *3 (S.D.N.Y 2012) (reasonable suspicion found where

officer "was responding to a knife fight in progress and stopped plaintiff upon receiving a tip

from a witness at the scene"). Therefore, the Kaleida defendants' initial stop of White was

lawful.

### 2. White's Reaction, the Subsequent Struggle, and Arrest

  The Kaleida defendants state that "[p]laintiff was arrested for being combative,

making threats against Gullo and Ciechalski and for attempting to reach Gullo's duty belt."

Kaleida defendants' MOL [52-8] at 4. Gullo testified that, after Ciechalski's initial grab, White

"pulled away aggressively" and "tr[ied] to grab/strike Lieutenant Ciechalski". Gullo Deposition

[52-6] at 50. Ciechalski testified that White responded to being grabbed "[w]ith a quick

movement towards me". Ciechalski Deposition [52-5] at 17. These alleged actions would

ultimately form the basis for the charges levied against White, i.e., harassment in the second

degree and obstructing governmental administration in the second degree. See [50-1]

Conversely, White testified that he took no such actions and merely "struggled to get away" from

what he perceived to be an unlawful detention. See White Deposition [52-4] at 39.

While a reasonable jury might credit White's testimony in that regard, the fact remains that, as discussed above, White was incorrect in his belief that the Kaleida defendants' attempt to detain him was unlawful. The attempted detention being lawful, White's admitted attempt to resist such detention was met with use of force by officers to subdue him, which was within their authority to do. *See* Graham v. Connor, 490 U.S. 386, 396 (1989) ("Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Without commenting on the veracity of any of the officers' specific allegations, White was clearly resisting the Kaleida defendants' attempts to detain him. Exhibit 1a [67-1].

Resisting a lawful investigatory stop can be an independent criminal act. *See* Wheeler v. Artola, 852 F. App'x 589, 591 (2d Cir. 2021) (Summary Order) ("[b]ecause Wheeler refused to follow the officers' [legal] orders . . . , the officers had probable cause to arrest him for obstruction of governmental administration"); N.Y. Penal Law § 195.05 (a person commits the charge of obstructing governmental administration in the second degree when, among other things, "he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference"); People v. Romeo, 9 A.D.3d 744, 745 (3d Dep't 2004) (conviction for obstructing when defendant repeatedly ignored lawful orders); People v. Greco, 151 Misc. 2d 859, 861 (App. Term, 2d Dep't, 9th & 10th Jud Dists. 1992) ("defendant's conviction of obstruction of governmental administration based on the allegation that defendant's actions in fleeing the scene of the stop for the speeding ticket, prevented the officer from issuing the ticket, was supported by the evidence"). After all, "[i]f the law authorizes police to act, a physical resistance intended to thwart that authority must have

consequences. To say otherwise would defeat the purpose of the law which permits the authority in the first place." People v. Darby, 60 Misc. 3d 1063, 1069 (N.Y. City Ct. 2018).

        White was ultimately charged with obstructing governmental administration in the second degree, though that charge was based on specific alleged elements of White's resistance. *See* Supporting Deposition [52-7] (alleging "threats" and "combative" behavior by White, including attempts to grab the officers' duty belts). However, that distinction is irrelevant because the officers had probable cause to believe that a criminal act had occurred, whether or not it was exactly the same act with which he was eventually charged. *See* Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006) ("a plaintiff is not entitled to damages under §1983 for false arrest so long as the arrest itself was supported by probable cause, regardless of whether probable cause supported any individual charge identified by the arresting officer at the time of arrest"). Additionally, the officers could have considered White's agitated reaction to their lawful attempt to detain him as further corroboration of the original reports that he had been involved in a fight on the sixth floor, bolstering an already strong case for probable cause. *See*, *e.g.*, People v. Smalls, 292 A.D.2d 213, 213-14 (1ˢᵗ Dep't 2002) ("[t]he initial detention of defendant was based on reasonable suspicion since he fit the description . . . , and the circumstances ripened into probable cause when the undercover officer made a confirmatory identification").

        Since the Kaleida defendants had probable cause to believe that White had committed (or was committing) a crime at the time of the arrest, their arrest of White was privileged, and his claim for false arrest against them must fail.

**3.      Continued Detention by the City Defendants**

White also alleges false imprisonment against the City defendants for their actions in taking custody of White and continuing his detention overnight until his arraignment the following morning. Amended Complaint [22] at 6-7; White's SOUF [57-1], ¶ 13. The City defendants argue that this continued confinement of White was privileged by probable cause. City defendants' MOL [50] at 8-12.

   The probable cause analysis as to the City defendants is slightly distinct, because they were not privy to the events above, and were merely relying on the statements of the Kaleida defendants.  The same general considerations apply, however. Probable cause "is a complete defense to an action for false arrest". Ackerson, 702 F.3d at 19. An officer has probable cause to arrest or detain "when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Garcia, 779 F.3d at 92.

"A law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." Fabrikant, 691 F.3d at 216; Martinez, 202 F.3d at 634; Gutierrez, 2021 WL 681238 at *7. I see no reason why this rule should not apply in equal measure where the victim/eyewitness is a peace officer. See, e.g., Panetta, 460 F.3d at 396 ("a reasonable officer could rely on the observations of . . . a [presumed] peace officer").

Here, the City defendants took custody of White from the Kaleida defendants after his arrest and the occurrence of the operative events. City defendants' SOUF [50] at ¶4; White's SOUF [57-1] at ¶4. Officer LaRusch charged White with harassment in the second

degree and obstructing governmental administration in the second degree. Misdemeanor Information [50-1]; City SOUF [50] at ¶7; White's SOUF [57-1] at ¶7; LaRusch Declaration [50] at ¶8. Officer LaRusch had no personal knowledge of the incident and charged White solely based on information provided to him by Sergeant Gullo. City SOUF [50] at ¶7; White's SOUF [57-1] at ¶7; LaRusch Declaration [50] at ¶¶5, 6, 8. Such information included a "supporting deposition" that was completed by Sergeant Gullo and provided to Officer LaRusch at the time White's custody was transferred. LaRusch Declaration [50] at ¶¶6, 8 (referring to Supporting Deposition [52-7]). The supporting deposition stated that White had refused orders to stop, made threats to officers Gullo and Ciechalski, "became combative" with both officers, and had grabbed Gullo's duty belt and attempted to grab Ciechalski's. [52-7].

White "disputes" that Sergeant Gullo prepared or provided this supporting deposition at the time of his transfer to the Buffalo Police Department custody. White's SOUF [57-1] at ¶¶7-8. However, LaRusch clearly states in his declaration that he received the supporting deposition at the time of exchange of custody. LaRusch Declaration [50] at ¶¶6, 8; *see also* Supporting Deposition [52-7] (dated August 2, 2017); Gullo Deposition [52-6] at 48 (stating that he "believe[d]" the supporting deposition was done at that time). White adduces no evidence to contradict LaRusch's sworn statement, other than to call into question his failure to check the box indicating that supporting deposition was attached to the two misdemeanor informations. *See* [50-1]. While it is unclear why the box would not have been checked, the factual allegations in the misdemeanor informations mirror the wording of Gullo's supporting deposition, *i.e.*, that White became "combative" with Gullo and was grabbing his duty belt. *See* Misdemeanor Informations [50-1]; Supporting Deposition [52-7]. The obvious conclusion is that LaRusch must have relied on Gullo's statements in drafting those documents.

Further, while there may be questions of fact as to whether Gullo's allegations were true, the City defendants were not required to resolve those questions. *See* Jean v. Montina, 412 F. App'x 352, 354 (2d Cir. 2011) (Summary Order) (an officer's "failure to conduct a more extensive investigation before arresting [plaintiff] does not defeat probable cause"); Walczyk v. Rio, 496 F.3d 139, 160 (2d Cir. 2007) ("a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest") (internal quotation marks omitted); Panetta, 460 F.3d at 398 ("[o]nce an officer has probable cause, he or she is neither required nor allowed to continue investigating, sifting and weighing information") (internal quotation marks omitted). Nor does the alleged failure by the City defendants to review the security footage, to the extent such footage would have exonerated White, affect the existence of probable cause. *See* Stark v. City of New York, 2021 WL 5628229, *3 (E.D.N.Y. 2021) (holding that a detective had no duty to watch a video that would have purportedly exculpated plaintiff).

In sum, because the City defendants had no reason to doubt Gullo's eyewitness account of White's alleged actions, they had probable cause to support his continued detention. Accordingly, White's detention was privileged, and his false arrest/imprisonment claim cannot stand.

## C.    Excessive Force

White also asserts a claim of excessive force against Kaleida peace officers Gullo and Ciechalski in connection with their actions in detaining White. Amended Complaint [22], ¶¶54-59. White testifies that two other officers put a knee on his neck in manner "almost identical to the George Floyd situation" for "about 30 seconds". White Deposition [52-4] at 40. He identifies the two officers as Officer James Ratel, who "pressed his knee into [his] back" and

-16-

Officer Robert Kemp, who "pressed his knee into [his] neck". White's SOF [59-1], ¶16. White

otherwise alleges being generally "manhandled" by Gullo and Ciechalski ([22], ¶27), and that

Officer O'Sullivan placed the handcuffs on him too tightly. White's MOL [59] at 14. White

claims he was left with "bruising and swelling" on his arm, "lingering pain to his back and

shoulder", and post-traumatic stress disorder as a result of the physical encounter. [22], ¶57.

   White's primary argument seems to be that the use of force at all was unjustified

because the officers had no right to detain him. White's MOL [59] at 15-16. As discussed above,

this was not the case. Rather, "[i]t is well-settled that 'the right to make a lawful arrest carries

with it the right to use reasonable force to effectuate that arrest.'" Lin v. County of Monroe, 66 F.

Supp. 3d 341, 358 (W.D.N.Y. 2014). Still, "[t]he fact that a person whom a police officer

attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of

some degree of force, but it does not give the officer license to use force without limit". Sullivan

v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000). That is, "a lawful arrest" for resisting arrest

"may be accompanied by excessive force". Tracy v. Freshwater, 623 F.3d 90, 99 (2d Cir. 2010).

   In the context of arrests, "claims that law enforcement officers have used

excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness'

standard". Graham, 490 U.S. at 395. The reasonableness standard is an objective one, evaluated

from the perspective of a reasonable police officer at the time of the incident. Id. at 396; see

Tracy, 623 F.3d at 96. The inquiry requires "balancing the nature and quality of the intrusion on

the plaintiff's Fourth Amendment interests against the countervailing governmental interests at

stake". Tracy, 623 F.3d at 96. "The calculus of reasonableness must embody allowance for the

fact that police officers are often forced to make split-second judgments - in circumstances that

are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a

particular situation." Graham, 490 U.S. at 396-97. Such calculus accounts for the well-worn axiom that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment". Id. at 396 (quotations omitted). For that reason, "to succeed on a Fourth Amendment excessive force claim, a plaintiff must show that the amount of force used was 'objectively unreasonable'". Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996).

       White's claim fails to meet that standard here. To begin with, the Amended Complaint alleges excessive force only against officers Gullo and Ciechalski. [22] at 8-10. White's only allegations against these two defendants are that they "grabbed Plaintiff's arms, forcing them behind Plaintiff's back in a violent manner" and generally "manhandled" him. Id., ¶27. To assess these claims, I refer to the surveillance video [67], which I find to be sufficiently clear so as to be decisive on the issue of excessive force. See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Monahan v. City of New York, 2022 WL 954463, at *4 (S.D.N.Y. 2022) ("In certain circumstances, video evidence may be so clear and unambiguous that a court deciding a summary judgment motion may rely solely on the video, and need not afford weight to conclusory or non-credible assertions that are inconsistent with the 'blatant' video evidence.").

       The surveillance video shows that, after Ciechalski grabs White's shoulder, White pulls himself away. Post-argument Exhibit 1a [67-1] at 00:07.[5] The two officers attempt to gain control of his arms as White forcefully attempts to pull them away. Id. at 00:08-18. The three men stay on their feet and continue to struggle for leverage as the officers eventually gain control of White's arms. Id. at 00:19-54. At about the 00:55 mark, White wrestles his left arm loose from Gullo's grasp, wraps it around Ciechalski, and the three men tumble to the ground. Id. at 00:55-

---

[5]      Timestamp refers to the time on the video file itself rather than the actual date and time stamp.

59. Ciechalski grabs White in a headlock as Gullo and other arriving officers attempt to pull his arms behind his back. Id. at 01:00-10. As the other officers gain control over White, he appears to stop struggling, at which point Ciechalski releases his hold and gets up. Id. at 01:11-25. Soon after, as the other officers take control, Gullo releases his grip and stands up as well. Id. at 01:33.

There is no question that, regardless of White's subjective belief as to whether the Kaleida officers were entitled to detain him, White was actively resisting their efforts to do so. The existence of such active resistance is a key consideration is determining the objective reasonableness of an arresting officer's use of force. See, e.g., Graham, 490 U.S. at 396. Accordingly, physical efforts by arresting officers in line with, or exceeding, those of Gullo and Ciechalski here have been considered objectively reasonable as a matter of law. See Tracy, 623 F.3d at 98 ("[g]iven that [plaintiff] was clearly resisting arrest at that point, it was not unreasonable for [defendant] to respond by diving on top of [plaintiff] and pinning him down so that he could not get back up and continue to flee); Neal v. Wilson, 2017 WL 4129635, *7 (S.D.N.Y. 2017) (because "plaintiff admits that he responded by 'pushing the officers off of himself,' 'trying to break their hold,' 'physically trying to get away,' and 'stiffening up his arms' . . . , no reasonable factfinder could find that this initial use of force [including alleged "hits, grabs, and pulls" by the officers] was unreasonable under the circumstances"); see also LaFever v. Clarke, 525 F. Supp. 3d 305, 333 (N.D.N.Y. 2021) (dismissing allegations that "two officers tackled [plaintiff], rolled her on the floor, threw her against the walls, and then dragged her out of the room" because "the admitted facts establish that LaFever acted aggressively during the entirety of the police encounter and continuously physically resisted the officers' attempts to arrest her").

Thus, some degree of force will be expected, and even necessary, when officers attempt to subdue a person resisting a legal arrest. Here, I find nothing egregious or excessive about the Kaleida defendants' use of force, which appeared to be largely proportional and responsive to White's actions. Further, while the seriousness of an injury is "not dispositive of an excessive force claim . . .  evidence of a plaintiff's injury is still relevant, 'because it is probative of the amount and type of force actually used by the arresting officers'". LaFever, 525 F. Supp. 3d at 332 (citation omitted). The slight bruising to White's upper arms is, in my view, altogether consistent with the reasonable force used by the officers in subduing a resisting suspect. Therefore, I agree with defendants that no reasonable factfinder could find Gullo and Ciechalski's actions to be objectively unreasonable.

To the extent White's excessive force claim can be extended to the other Kaleida defendants, he still fails to demonstrate an objectively unreasonable use of force. While the video demonstrates that officers Ratel and Kemp indeed placed their knees onto White's back while he was being handcuffed, they did so only for a brief time. Indeed, Kemp's knee appears to be on White's upper back for only seven or eight seconds before he appears to shift his weight back and off White. [67-1] at 01:33-41. In any event, these actions were taken for the purpose of completing an arrest of a resisting subject and were discontinued when the subject was sufficiently subdued. See Style v. Mackey, 2020 WL 3055319, *5 (E.D.N.Y. 2020) ("a knee was placed on his back only to effectuate the arrest, and it was removed as soon as he was brought to his feet. Such action is a far cry from one supporting an excessive force finding") (citing cases). The operative question is not whether there was some lesser action law enforcement officers could have taken, but whether the actions taken were objectively unreasonable. In my view, no reasonable jury could find these actions to be objectively unreasonable.

Finally, White alleges that Officer O'Sullivan placed the handcuffs on him too tightly. White's Memorandum of Law [59] at 14. Excessive force as it pertains to the use of handcuffs is governed by its own, more exacting, standard. "When evaluating a claim of excessive force based on the defendants' use of handcuffs, courts are to consider three factors: (1) whether the handcuffs were 'unreasonably tight'; (2) whether the 'defendants ignored the plaintiff's pleas that the handcuffs were too tight'; and (3) the 'degree of injury to the plaintiff's wrists.'" Falls v. Detective Michael Pitt, 2021 WL 1164185, *14 (S.D.N.Y. 2021). "Of these three factors, the third is 'particularly important,' for a plaintiff 'must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable.'" Here, we have no evidence that White complained about the tightness of the handcuffs, nor is there any evidence of injury to White's wrists. Accordingly, no reasonable jury could find this officer's use of handcuffs objective unreasonable. *See*, *e.g.*, Falls, 2021 WL 1164185 at *14 ("'the fact that the tight handcuffing did not cause Plaintiff any continuing injury is fatal to the excessive force claim,' and thus, the Court will dismiss the Handcuff Claim on this basis"); McKenzie v. City of New York, 2019 WL 3288267, *11 (S.D.N.Y. 2019) ("under the doctrine of qualified immunity, given McKenzie's failure to complain about the tightness of the handcuffs or to request that his handcuffs be loosened, a reasonable police officer could not be held accountable for excessive force"); Washpon v. Parr, 561 F. Supp. 2d 394, 407 (S.D.N.Y. 2008) ("[a] line of cases holds that minor injuries that result from tight handcuffs, such as temporary swelling, inflammation or soreness of an arrestee's wrists, are insufficient on their own to sustain a Fourth Amendment excessive force claim").

**D.    Malicious Prosecution**

Finally, White asserts a claim of malicious prosecution against Buffalo police officer Robert LaRusch in relation to his filing of the misdemeanor informations. [22] at ¶¶44-53.  LaRusch charged White with harassment in the second degree and obstructing governmental administration in the second degree. [50-1]. White was arraigned on those charges and attended four or five court appearances before they were dismissed after the arresting officers declined to appear and testify. White Deposition [52-4] at 116-117.

"To establish a malicious prosecution claim . . . a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Stampf v. Long Island Railroad Company, 761 F.3d 192, 198 (2d Cir. 2014). Like false arrest, probable cause is a complete defense for claims of malicious prosecution. Manganiello v. City of New York, 612 F.3d 149, 161–62 (2d Cir. 2010). However, probable cause in the context of malicious prosecution is slightly different from that of false arrest, in that it requires the existence of "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty" of the charged offense. Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003).

Nonetheless, "the law places a heavy burden on malicious prosecution plaintiffs" because of the "public policy favors bringing criminals to justice". Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195 (2000); see Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004). Moreover, an officer accused of malicious prosecution is entitled to qualified immunity if "'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context". Rios v. City of New York, 687 F. App'x 88, 90 (2d Cir. 2017) (Summary

Order) (citation omitted). Thus, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Dancy v. McGinley, 843 F.3d 93, 106 (2d Cir. 2016) (*quoting* Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam)).

   A person commits harassment in the second degree when, among other things, "with intent to harass, annoy or alarm another person . . . [h]e or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same." N.Y. Penal Law §240.26(1). A person commits the charge of obstructing governmental administration in the second degree when, among other things, "he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference". N.Y. Penal Law § 195.05.

   With respect to the second charge, as I discussed above, the allegations that White physically resisted a lawful detention constitute sufficient probable cause to support a charge of obstructing governmental administration. *See*, *e.g.*, Wheeler, 852 F. App'x at 591; Esmont v. City of New York, 371 F. Supp. 2d 202, 213 (E.D.N.Y. 2005) (rejecting malicious prosecution where "defendants observed Esmont obstructing Department of Health inspectors from performing a compliance inspection"); Romeo, 9 A.D.3d at 745; Greco, 151 Misc. 2d at 861. Accordingly, a malicious prosecution claim on this charge cannot stand.

   The first charge for harassment presents a slightly closer question. While the allegations by Officer Gullo that he "became combative" and was grabbing at his duty belt (*see* [52-7]) establish the "physical contact" element of the charge, it is less obvious that this contact was undertaken "with the intent to harass, annoy or alarm". *See* §240.26(1). However, I note that "[s]uch intent can be inferred from the act itself or from the defendant's conduct and the

surrounding circumstances". <u>People v. Caulkins</u>, 82 A.D.3d 1506, 1507 (3d Dep't 2011). To that

end, a reasonable officer could presume such conduct might cause the recipient annoyance or

alarm. *See*, *e.g.*, <u>People v. Simmons</u>, 42 Misc. 3d 462, 464 (Bronx County Criminal Court 2013)

(upholding harassment charge where officer "experienced annoyance, alarm and fear for his

personal safety"). The intent element might be further informed by Gullo's allegation that White

was "making threats" against the officers. *See* <u>People v. Pezza</u>, 49 Misc. 3d 131(A), 26 N.Y.S.3d

215 (App. Term, 2d Dep't, 9th & 10th Jud Dists. 2015) ("defendant's intent to harass, annoy or

alarm the complainant could be inferred from both defendant's verbal and physical actions, *i.e.*,

'from the act itself,' as well as from defendant's threatening conduct").  I therefore agree that

there was probable cause or at least arguable probable cause supporting this charge, and thus no

malicious prosecution charge can survive.

   Accordingly, I recommend that summary judgment be granted, and White's

malicious prosecution charge be dismissed.


**E.    Kaleida's crossclaim should also be dismissed.**

   The City defendants also move to dismiss the Kaleida defendants crossclaim

against them for indemnification. City defendants' MOL [50] at 12; Kaleida defendants' Answer

[28], ¶31.  The Kaleida defendants do not respond the City defendants' motion. In any event, I

agree with the City defendants that indemnification is not available given the nature of White's

claims. *See* <u>Davis-Guider v. City of Troy</u>, 2019 WL 1101278, *12 (N.D.N.Y. 2019) ("although

the Second Circuit has not weighed in on this issue, federal district courts in New York have

routinely held that a party cannot seek indemnification or contribution for a 42 U.S.C. § 1983

claim"); <u>M.O.C.H.A. Society, Inc. v. City of Buffalo</u>, 272 F.Supp.2d 217, 221 (W.D.N.Y. 2003).

Therefore, the Kaleida defendants' crossclaim should be dismissed.

## CONCLUSION

For these reasons, I recommend that both motion for summary judgment [50, 52] be granted in their entirety, and the claims and crossclaims against them be dismissed. Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by June 15, 2022. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:  June 1, 2022

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge